Jamie M. Woolsey, WSB # 6-3985
Ian K. Sandefer, WSB # 6-4334
Sandefer & Woolsey, Trial Lawyers LLC
143 North Park Street
Casper, WY 82601
Telephone(307) 232-1977; FAX (307) 333-6508
Email: jamie@swtriallawyers.com, ian@swtriallawyers.com

Terry J. Harris, WSB # 5-2068
HARRIS, HARRIS & QUINN, P.C.
P.O. Box 368
2618 Warren Avenue
Cheyenne, Wyoming 82003-0368
Telephone (307) 638-6431
Email: tjharrispc@gmail.com

Edwin S. Wall, WSB # 5-2728
Wall Law Office
43 East 400 South
Salt Lake City, Utah 84111
Telephone (801) 746-0900
Email:  edwin@edwinwall.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 19-CR-171-ABJ |
| | ) | |
| GREGORY J. BENNETT, MATTHEW | ) | |
| "TY" BARRUS, and DEVIN E. DUTSON | ) | |
| | ) | |
| Defendants. | ) | |

## MOTION TO LIMIT GOVERNMENT'S DESIGNATED EXPERT WITNESSES PURSUANT TO FEDERAL RULE OF EVIDENCE 702, 403 AND *DAUBERT*

**COME NOW** the Defendants, Gregory J. Bennett, by and through his attorney Jamie M.

Woolsey,  Matthew "Ty" Barrus, by and through his attorney, Terry J. Harris, and Devin E. Dutson,

by and through his attorney Edwin S. Wall, and hereby move the Court for an order limiting Lisa Brockman, Brenda Stout, Cory Livingston, and Brad Bell's testimony at trial based upon Federal Rules of Evidence 702, *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 593–94 (1993), *Kumho Tire Co., Ltd.*, 526 U.S. 151 (1999), *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965 (10th Cir. 2001), Federal Rule of Criminal Procedure 16(a)(1)(G), and Federal Rules of Evidence 402 and 403. In support of this Motion, Mr. Bennett, Mr. Barrus, and Mr. Dutson state as follows:

## I.    Background

On January 11, 2020, the Government filed *Government's Expert Witness Designation* (ECF No. 153), three weeks after its self-requested nine-week deadline. *See Defendants Gregory J. Bennett's and Matthew "Ty" Barrus' Motion to Strike the Government's Untimely Designated Expert Witnesses* (ECF No. 164). The Government listed a total of four purported expert witnesses in its late designation. The first three witnesses work for the State of Wyoming, either for Wyoming Medicaid or with the Medicaid Fraud Control Unit. These three individuals are Lisa Brockman, Brenda Stout, and Cory Livingston. The fourth witness is Brad Bell, a forensic accountant with the FBI. Aside from general background information about the Wyoming Medicaid Program, Ms. Brockman, Ms. Stout and Ms. Livingston are listed in an expert capacity to provide identical, word-for-word, opinions.

The qualifications the Government outlines, and that are contained within the resumes attached to its designation, unequivocally show that Ms. Brockman, Ms. Stout, and Ms. Livingston are unqualified to render expert opinions regarding the medical necessity or therapeutic value of the treatment the Northwest Wyoming Treatment Center (hereinafter "NWTC") offered. At the

end of the day, these are fact witnesses regarding the Medicaid program and how it functions, or should function, in a perfect world.

Finally, the deficient designation of Brad Bell was briefly addressed in Defendants' *Motion to Strike Untimely Government Witnesses*. *See* ECF No. 164. While Mr. Bell's training and experience may be sufficient to qualify him to offer expert testimony at trial, the Government's designation is wholly deficient and leaves the Court and counsel to engage in guesswork as to what Mr. Bell's actual opinions are, and the underlying bases therefore.

## II.      Law and Argument

The Court, at the April 24, 2020 hearing, which was more than twenty months before the Government filed its designation in this case, cautioned counsel about complying with the Court's order for designating experts and the substance of such designations the Court expected: "I agree 100 percent. The designations have become pretty sloppy. It seems particularly important in a case like this one." *See* April 24, 2020 *Transcript of Motion Proceedings* at p. 34. The Court's *Discovery And Scheduling Order*(s) in this case, entered October 2 and 3, 2019, required the Government to "disclose to the defendant a written summary of testimony the government intends to use under Federal Rule of Evidence 702, 703, or 705 during its case-in-chief at trial." *See* ECF Nos. 40 and 49, at p. 3. Further, the Court ordered that the "summary must identify the witnesses as well as describe the witnesses' opinions, the bases and reasons therefor and their qualifications." *Id*.

On the subject of expert testimony, Rule 702 of the Federal Rules of Evidence requires as follows:

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a

> fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The purpose of Rule 702 is not to provide blanket admissibility of expert testimony, but to vest with the trial court the discretion to exclude testimony deemed unnecessary or not helpful to the trier of fact in reaching an independent conclusion as to the facts. *See, e.g., Abraham v. Graebel Van Lines, Inc.*, 2016 U.S. Dist. LEXIS 49139 (D. Wyo. 2016) at pp. 5-7. The burden of proving the foundational requirements lies with the proponent of the evidence. *Id.* at pp. 5-6; *see also United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) ("The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible.").

The United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), articulated the standard by which scientific expert testimony is to be evaluated. Under the first prong of the *Daubert* analysis, a court must determine whether the reasoning or methodology underlying the testimony is scientifically valid. *Daubert*, 509 U.S. at 591.

*Daubert* set forth a non-exclusive list of four parameters to focus the trial court's determination: 1) whether the theory or technique in question can be and has been tested; 2) whether it has been subjected to peer review and publication; 3) its known or potential rate of error along with the existence and maintenance of standards controlling the technique's operation; and 4) the degree of acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 594-95.

The second part of the *Daubert* approach requires the trial court to determine whether the testimony "fits" the disputed issues of fact. *Daubert*, 509 U.S. at 591. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999) affirmed the decision in *Daubert* and held that the *Daubert*

factors apply to all expert testimony proffered under F.R.E. 702.  In *Kumho*, the Court held the

benchmarks for admissibility of expert testimony are reliability and relevance:

> We conclude that *Daubert's* general principles apply to the expert matters described in Rule 702.  The Rule, in respect to all such matters, 'establishes a standard of evidentiary reliability.' * * * It 'requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility.'  And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, * * * the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'

*Kumho*, 526 U.S. at 149.  Each expert's opinion(s) are subject to the same standards of reliability

that govern the opinions of strictly scientific experts retained for the purposes of litigation.  *Id.* at

151 (holding *Daubert* applies even when an expert's opinion relies on skill or experience-based

observation).

### A.  Duplicative and Cumulative Expert Witnesses

The first failure of the Government to properly designate its purported experts is evidenced

by its "cut and paste" designation as to what it hopes the Court will permit Ms. Brockman, Ms.

Stout, and Ms. Livingston to testify to at trial.  In terms of what the Government discloses as to

the opinions it intends to elicit from each of the three State of Wyoming employees, the following

paragraph is offered as to each:

> [Ms. Brockman, Ms. Stout, and Ms. Livingston] will opine that: (1) activities described in progress notes and supervision sheets created by the Defendants and NWTC employees at the direction of the Defendants describe non-covered services for which Wyoming Medicaid would not pay; (2) procedure codes H0005, H0047, H2015, and H2015-HK used by the Defendants and NWTC employees at the direction of the Defendants to bill these non-covered services did not accurately describe these activities such that Medicaid could determine whether the services were covered; (3) Wyoming Medicaid would not have paid for these activities if the program had known their true nature; and (4) the services NWTC billed under procedure code

> H2021 did not qualify as H2021 community mental health treatment, and Medicaid would not have paid these bills if the program had known the true nature of the billed-for services.

*See* ECF 153 at pp. 5-7, 9.  There is absolutely no variation as to what the Government asks the Court to permit each of these witnesses to opine to the jury.  As this Court is aware, under the civil local rules, "the parties are limited to the designation of one expert witness to testify for each particular field of expertise."  *See* D. Wyo. Local Civ. R. 26.1(e)(1).  While this is not a civil case, the same principle should be properly applied here.  Moreover, Federal Rule of Evidence 403 precludes a party at trial from needlessly presenting cumulative evidence.

Pursuant to Federal Rule of Evidence 702, the proffered expert testimony must "help the trier of fact."  As part of whether an expert's testimony will be helpful to the trier of fact, the Court is required to engage in an analysis under Federal Rule of Evidence 403.  In *United States v. Scavo*, 593 F.2d 837, 844 (8th Cir. 1979) the Court succinctly stated the rule as follows:

> Expert testimony must still meet the criterion of helpfulness expressed in Rule 702 and is also subject to exclusion under Rule 403 if its probative value is substantially outweighed by the risks of unfair prejudice, confusion or waste of time.

*Id*. citing 3 J. Weinstein & M. Berger, Weinstein's Evidence P 704(01) at 704-9 (1978).[1]

To the extent that any one of the witnesses is qualified to testify as an expert in the area of how Wyoming Medicaid does, or should, work, expert opinion testimony should be limited to one witness in this particular field.  Permitting three separate state-employees to opine to the jury the identical opinions would be needlessly cumulative, unfairly prejudicial, and would constitute a waste of time.

---

[1] *See Daubert*, 509 U.S. at 595 (citations omitted): "Judge Weinstein has explained: 'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'"

Accordingly, even if the Government is able to meet the qualifications for the admission of expert opinions from any or all of the proffered State of Wyoming employees, only one should be permitted to testify pursuant to Federal Rules of Evidence 702 and 403.

B. **Ms. Brockman, Ms. Stout, and Ms. Livingston's Inadequate Qualifications and Improper Opinions**

Under *Daubert* and *Kumho*, the state-employee witnesses should not be permitted to offer opinions to which they are unqualified to offer because of their lack of education and credentialing. Additionally, the Government has listed these witnesses to offer opinions that should never be permitted because it would invade the province of the Court and the jury.

First, the Government's disclosure speaks only in generalized terms as to "Wyoming Medicaid rules" that may apply, but never provides any specific basis for the ultimate opinions offered. The Government simply, in a bare bones manner, states that its three state-employee witnesses will testify that Wyoming Medicaid would not have paid for the "non-covered services" provided to inpatient children at NWTC. Because the Government provides only vague and general conclusions, it is impossible for the Court or Defendants to address either the "reliability" or the "relevance" prongs of *Daubert* and *Kumho*. Additionally, absent the requisite information regarding the opinions they may offer and the vague generalities of their conclusions the Government has not articulated sufficient grounds to establish the probative value of the experts' testimonies.

In order to determine the reliability of the opinions, the Court must consider the principles and methodology that the expert used to arrive at his or her opinion. Here, the Government fails to inform the court or the defense which specific rules its purported expert applied to specific services. The Government has alleged a conspiracy occurring between 2009 and 2015 and there are approximately 100,000 pages of treatment notes. The Government has failed to identify a

single specific service in its designation, or which provision or permutation of the rules, regulations or law the purported expert has determined, makes that specific service "non-covered." Again, the Government's deficient designation relegates a reliability determination to mere speculation as to what principles and methodology were applied.

As to relevance pursuant to Federal Rule of Evidence 402, the Government's designation fails to provide the underlying facts and basis upon which the expert ultimately bases its opinions. Again, there is generalized commentary on rules and manuals, but no factual recitation upon which to gauge relevancy. With respect to Ms. Livingston, the Government has indicated that she will testify that Defendants submitted claims for approximately $8.6 million dollars under four procedure codes, and that Wyoming Medicaid paid Defendants approximately $8.5 million. There is an inference that can be made from the Government's designation that Ms. Livingstons's testimony will be that a portion of this amount was improper, but there are no facts provided to qualify or quantify this opinion. For example, how much of this $8.5 million was for services that the Government does not contest? The Government has never alleged that 100% of the services provided by NWTC was fraudulent. Without facts and context, which the government fails to provide, testimony regarding the amount of money paid to NWTC over a six and a half-year period is irrelevant, misleading, highly prejudicial, and improper. To permit the Government to imply that $8.5 million paid for services was somehow criminal through an expert, without providing facts upon which the expert relies, would constitute an improper burden shift onto the Defendants.

Perhaps it was said best in *United States v. R.J. Reynolds Tobacco Co.*, 416 F. Supp. 316, 325 (D.N.J. 1976): "Opinions are valueless as evidence without exploration of the underlying facts and rationale showing the path from the facts to the opinion." Here, the Government provides no

facts from which to follow the path to the opinions offered.  Accordingly, the Government must fail this prong as well.

As shown by each of their resumes, none of the State employees listed by the Government are qualified to render proper opinions as to "medical necessity" or the "therapeutic value" of the services NWTC provided as part of its residential treatment of Wyoming youth suffering from addiction and other mental health issues.  The highest degree Ms. Brockman holds is an Associate's degree in Nursing from Laramie County Community College.  Ms. Stout's highest level of education is a Bachelor of Arts in Psychology.  Ms. Livingston holds a Master of Healthcare Administration and Management.  None of these degrees qualify any of the prospective witnesses to properly opine as to the medical necessity of the treatment provided to the inpatient children treated as part of NWTC.  None of the witnesses can opine as to the standard of care for treating such children, as none of these witnesses are licensed professionals or psychologists.  In fact, as the Government surely knows, and as is indicated in evidentiary materials in this case, Wyoming Medicaid and the Medicaid Fraud Control Unit (MFCU) regularly rely upon doctors' and licensed professionals' opinions as to what is medically necessary and therapeutic when dealing with billing issues.

The Government seeks to have all three of these witnesses testify, *inter alia*, that "activities described in progress notes and supervision sheets created by the Defendants and NWTC employees at the direction of the Defendants describe non-covered services for which Wyoming Medicaid would not pay...."  Contrary to what the Government has been representing since this case's inception, "recreational therapy" is, and has been, a recognized and compensable form of treatment for the children being placed in NWTC's inpatient care.  The rules and Medicaid's own manuals provide for this—despite the Government's repeated contentions to the contrary.  To this

point, the most recent version of the CMS-1500 Provider Manual (10/25/21) addressing the

treatment that we are concerned with in this case, states, under "Covered Services," as follow:

> **Children's Psychosocial Rehabilitation** (Community Mental Health and Substance Abuse Treatment Centers only): This service is designed to address the emotional and behavioral symptoms of youth diagnosed with childhood disorders, including: ADHD, Oppositional Defiant Disorder, Depression, Disruptive Behavior Disorder, and other related disorders. Within this service there are group and individual modalities and a primary focus on behaviors that enhance a youth's functioning in the home, school, and community. Youth will acquire skills such as conflict resolution, anger management, positive peer interaction, and positive self-esteem. Treatment interventions include group therapy, activity-based therapy, psycho-educational instruction, behavior modification, skills development, and similar treatment to implement each enrolled Member's treatment plan....

> [...]

> **Individual Rehabilitative Services** (Community Mental Health and Substance Abuse Treatment Centers only): Contact with the enrolled Member for the purpose of implementing that portion of the Member's treatment plan targeted to developing and restoring basic skills necessary to function independently in the home and the community in an age-appropriate manner. As well as for the purpose of restoring those skills necessary to enable and maintain independent living in the community in an age-appropriate manner, including learning skills in use of necessary community resources. Individual rehabilitative services assist with the restoration of a recipient to their optimal functional level. This service is targeted at reducing or eliminating specific symptoms or behaviors related to a recipient's mental health and/or substance use disorder(s) as identified in the treatment plan.

*Id*. at p. 184-86. None of the Government's purported experts have stated that she has reviewed

the member's "treatment plan," and determined that the modalities used with the children failed to

correspond to the treatment plan. Furthermore, none of the designated witnesses would be

qualified to offer such an opinion.

The Government used the *Wyoming Medicaid Program Community Mental Health &
Substance Abuse Services Manual* (revised 11/09/10) (the 2010 "*Manual*"), applicable to child and
adolescents, in seeking an *Indictment* of the Defendants. The language in the manual the
Government used is essentially identical to the language contained in the October 25, 2021 version
of the CMS-1500, with the exception of some minor grammatical changes and the current version
adding the last two sentences under the "Individual Rehabilitative Services" paragraph.  While the
Government went to great lengths to emphasize a one-page excerpt from the 2010 *Manual*
discussing "non-covered services," it ignored other language elsewhere in the *Manual* that
expressly permits an adolescent addiction treatment facility such as NWTC to engage in those very
same activities as part of a treatment plan.  For instance, in the 2010 *Manual* the Government
presented as an exhibit to the grand jury, the *Manual* expressly states that one of the reasons for
payback of funds could be, "Billed services that are *solely* recreational, social, vocational, or
maintenance, that do not correlate with the treatment plan."  (Italicized emphasis added.)  There
are any number of similar examples of this sort of inconsistency found within the *Manual*.

Moreover, the 2010 *Manual* also expressly provides, under the heading "Provider's Right
to Exercise Professional Judgment," that "A medical provider is expected to use professional
judgment when rendering services, provided such services are rendered within the scope and intent
of this document." Yet here, the Governments hopes to place before these Defendants' jury
opinions from purported expert witnesses lacking the very professional qualifications that
Wyoming Medicaid would require in order to properly treat these very NWTC addicted
adolescents.

Again, the Government does not even attempt to designate a witness to link the treatment
modalities being used by NWTC with some of the most psychologically damaged, and hard to

reach, children in the State of Wyoming with their actual treatment plans established by licensed professionals. Ms. Brockman, during a February 21, 2017 interview with the FBI, admitted that signing off on a "treatment plan" or determining whether something is a "medical necessity" requires a properly licensed professional, as defined in the *Manual*. *Interview of Lisa Brockman – February 21, 2017* at p. 18. Ms. Brockman, again and again, informs the FBI interviewer that various activities which the Government now claims are not compensable, can be properly billed if they are part of the child's treatment plan. For instance, when the FBI asked if "a wilderness survival program or something" could be properly billed to Medicaid, Ms. Brockman's answer was, "It depends on what their treatment plan says." *Id*. at p. 29. She informs the FBI interviewer that children can work on "communication skills" if it is part of their treatment plan. *Id*. "Skills training" can be properly billed. *Id*. at pp. 29-30. Ms. Brockman does make a bare bones statement at the beginning of her interview that "recreation and socialization services" cannot be billed, *see id*. at p. 10, but she then goes on to offer a number of caveats or examples as to the various ways these activities can be billed if part of the child's treatment plan.

As to each of state-employee witnesses the Government has offered, it has stated that it intends to have the witnesses testify as to "activities described in progress notes and supervision sheets created by the Defendants and NWTC employees at the direction of the Defendants," but fails to correlate the "activities described" to the individual child's treatment plan. Without doing so, the evidence if incomplete and highly misleading. As Medicaid's own manual states, which the Government relied upon in obtaining an *Indictment*, repayment is only proper if the following is true: "Billed services that are *solely* recreational, social, vocational, or maintenance, that do not correlate with the treatment plan." Here, the Government has failed to designate a proper expert for the purpose of opining on whether the billed for services are *solely* for recreational, social,

vocational, or maintenance, and if the services properly corresponded to the individual child's treatment plan.

Further, it is the Judge's role to define the applicable law for the jury in any given case. Applying the law to the facts of the case is jury's province, and a witness may not do so—expert or otherwise. As previously stated in Mr. Bennett and Mr. Barrus' *Motion to Strike* (ECF No. 164), the witnesses cannot properly be used to define the applicable law and, further, to inform the jury how the witness would apply it. *See, e.g., Specht v. Jensen*, 853 F.2d 805, 810 (1988) (en banc) ("...when the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based, the testimony cannot be allowed. In no instance can a witness be permitted to define the law of the case.").

The 2010 *Manual* clearly speaks for itself, and to instead allow these proffered witnesses to testify in this federal felony fraud prosecution to their individual or collective subjective interpretations in an effort to resolve any inconsistencies (and there are many) found within the *Manual*, would be both improper and unfair to these Defendants. The state-employee witnesses here may be able to testify generally about Wyoming Medicaid as a factual matter; however, conclusions as to applying the law (at a given time) to a billed service is the proper province of the jury. *See also Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 ( 10th Cir. 1998) ("Generally, an expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts."). To this end, Ms. Brockman is listed to testify regarding "applicable federal and state statutes, rules and program requirements." *See Government's Expert Witness Designation*, p. 3. In an attempt to bolster Ms. Brockman's qualifications, the Government notes that her job description included "drafting, promulgating, and enforcing policy and rules regarding Wyoming Medicaid's coverage." *Id*. The fact that the

State of Wyoming appears to have permitted someone that is not a licensed attorney to draft state policy and law, does not make her qualified to interpret the law. Ms. Brockman is an employee of the executive branch of the State of Wyoming.  Even if she is permitted input on rules, she is not an expert on how laws should be applied or interpreted.

Finally, in addition to the reasons stated above, the Defendants are concerned by the Government's designation statement that, "Medicaid would not have paid these bills if the program had known the true nature of the billed-for services."  This position is demonstrably false based upon the records Defendants have recently been able to obtain and information known to the prosecution team.

NWTC's employees kept detailed records of the nature of the services provided and, upon request, provided those records to Wyoming Medicaid and its designated agents.  As early as 2010, but likely before, the State was well aware of NWTC's program and its regular billing for recreational therapy group sessions, among other activities that the Government now charges are "fraudulent."  In fact, Ms. Brockman, in 2011, conducted an interview of a therapist from the Powell, Wyoming area who, on December 8, 2010, lodged a complaint against Dr. Gibson Condie and NWTC because the children were playing football, basketball, lifting weights, taking trips to the zoo, *et cetera*.  Wyoming Medicaid, in addition to Ms. Brockman's in-person interview of the complaining therapist, launched an investigation that included conducting an audit of NWTC's treatment records for at least twenty-three of the inpatient children.  In 2012, the records provided to the state clearly documented the patient's name, the activity, the time spent in the activity, the therapist or person billing under the therapist, as well as the Medicaid billing code for which the activity was billed.  NWTC's very first inpatient child's record documents the following:

> **Session Content:** [John Doe] participated in an exercise [*sic*] program that included 35 minutes of weight training and a cardio

vascular workout for 15 minutes on an elliptical glider to promote health lifestyle and increase coping skills.

**Assessment:** Participated fully with good attitude, [John Doe] seemed to enjoy working out.

**Plan:** To continue workouts on a regular basis.

NWTC provided this record, and literally thousands more like it, to Wyoming Medicaid pursuant to its April 17, 2012 NWTC audit and patient records requests.  A follow-up NWTC patient records request dated December 21, 2012, authored by "Susan Malm, Program Integrity Supervisor, Division of Healthcare Financing," Wyoming Department of Health, was sent to NWTC.  On January 28, 2013, the Medicaid Fraud Control Unit Director at the time wrote a letter to Dr. Gibson Condie, who was NWTC's supervising biller[2] from 2009 until 2015, stating as follows:

> The MFCU has finalized our review of all information from our investigation and **has not identified at this time any fraudulent activity** and has therefore elected to close further review of the allegations.

(Bold emphasis added.)  This letter and finding was written *after* an internal audit of NWTC's patient and billing records.  Needless to say, the State of Wyoming paid the claims it reviewed, and continued to pay the billed claims for services that were clearly documented in NWTC's records.

Some of this information has just come to light based upon evidence and Wyoming Medicaid records production made pursuant to the subpoenas *duces tecum* served on Wyoming Medicaid, Program Integrity, and the Wyoming Department of Healthcare Financing.  And it

---

[2] Under Wyoming state law, NWTC and its providers were, throughout much of the relevant time period charged in the *Indictment*, **legally required** to bill through a doctoral level practitioner who was to supervise the billing from the time NWTC came into existence until there was a law change in March of 2014.

belies credibility to suggest that MFCU was not made fully aware of all NWTC patient and billing records reviews performed by Wyoming Medicaid prior to and leading up to the MFCU Director's above-referenced 2013 letter to Dr. Condie. To say it another way, the Government and its prosecution team (*i.e.*, the MFCU) has been withholding and trying to stop production of exculpatory materials in its possession.[3]

Defendants feel obliged to call this to the Court's attention at this time in case the Government persists in its effort to put on testimony that it knows, or should know, is not supported by the evidence. Offering, in the form of an expert witness, a state-employee's sworn testimony to misleading and false opinions should not be permitted.

### C. Brad Bell's Deficient Designation

There is no better example of the deficiencies in the Government's expert designation than the designation of Brad Bell, forensic accountant. The Government asserts that, "Mr. Bell will testify to facts regarding NWTC's checking account, including the flow of money from the State of Wyoming into NWTC's account and then specific payments and transfers to the Defendants." *See Government's Expert Witness Designation* at p. 10. That is the extent of the designation of Mr. Bell's testimony, other than the fact that he will, apparently, base his testimony on "trial evidence" and be consistent with the previous testimony of FBI Agent Arlen Scholl. The Government fails to inform Defendants or the Court what exactly Mr. Bell's opinion regarding the "cash flow" is, or, further, to provide *any* basis for such an opinion. There is absolutely no discussion of Mr. Bell's reasons for his opinions, or what he relied upon, other than "evidence, including bank records." *Id*.

---

[3] This is not the only piece of exculpatory material that Defendants believe the Government has refused to turn over, but that will be the subject to a separate motion to compel to be filed in this matter.

If the Government's designation was not three weeks late in filing, the Defendants would have had sufficient time prior to trial to formally designate a rebuttal forensic accountant, with similar qualifications to Mr. Bell; namely, a forensic accountant and Certified Fraud Examiner.  The Defendants potential expert witness, D. Brent Robbins, has indicated that he cannot do a forensic review in this matter to rebut Mr. Bell because there is, in fact, nothing to rebut.  Specifically, Mr. Robbins states that he is available to offer a rebuttal opinion; however, based upon his knowledge and experience, there is not sufficient information in the Government's expert witness designation to know, or infer, what Mr. Bell's testimony will be.  Additionally, Mr. Robbins notes that with the absence of an adequate expert witness designation regarding Mr. Bell's testimony, there is not sufficient time to do a full forensic accounting analysis prior to the scheduled trial date.  *See Affidavit of D. Brent Robbins*, Exhibit 1.

Presumably, Mr. Bell will be offered as a witness to present a negative review of NWTC's cash flow, funds, and/or business. What this testimony might be is surely a guess at this point because there is no designation in this regard. If the Government intends to offer Mr. Bell to testify to nothing but the fact that NWTC received money from the State of Wyoming, deposited such money in its operating account, then NWTC paid the Defendants and other employees of the treatment center a salary as part of their employment with NWTC, this is something that can be addressed without an expert witness and by way of stipulation. Otherwise, the Government's designation of Mr. Bell should be excluded in its entirely.

### III.    Conclusion

WHEREFORE, and for all the reasons stated herein, the Defendants, Gregory J. Bennett Matthew "Ty" Barrus, and Devin Dutson respectfully requests that the Governments' witnesses at trial be limited as outlined above.

**DATED** and SIGNED this 25th day of January, 2022.

/s/ Jamie M. Woolsey
Jamie M. Woolsey (WSB # 6-3985)
Sandefer & Woolsey, Trial Lawyers, LLC
143 N. Park Street
Casper, WY 82601
Telephone (307) 232-1977
jamie@swtriallawyers.com


s/Terry J. Harris
Terry J. Harris, WyBar # 5-2068
HARRIS, HARRIS & QUINN, P.C.
P.O. Box 368
2618 Warren Avenue
Cheyenne, Wyoming  82003-0368
Telephone (307) 638-6431
tjharrispc@gmail.com

/s/ Edwin S. Wall
Edwin S. Wall (WSB # 5-2728)
Wall Law Office
43 East 400 South
Salt Lake City, Utah 84111
Telephone:  (801) 746-0900
edwin@edwinwall.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing was served this 25th day of January, 2022, as follows:

United States Attorney's Office          [_] U.S. MAIL
Eric Heimann                             [__] HAND DELIVERY
2120 Capitol Ave, Suite 4000             [__] EMAIL
Cheyenne, WY 82001                       [__] FACSIMILE
                                         [ X ] CM/ECF


/s/ Jamie M. Woolsey
Jamie M. Woolsey